Good morning. Good morning, Your Honor, and may it please the Court, my name is Charles Stephen Ralston, and I represent the appellants, Kelly Lal et al., in this case. And I'd like to reserve three minutes of my time for rebuttal. The main issue in this case, as it comes before the Court, is whether the plaintiffs were entitled to a jury trial to decide their claims, in this case, which is whether the officers acted reasonably or unreasonably when the decedent, Kamau Lal, was shot and killed. We allege, we claim that the District Court erred in granting summary judgment on those claims for a number of reasons. I'd just like to note, on looking at the District Court's decision, the District Court, in its discussion, relies almost solely on the declarations of the officers. It does not cite the deposition testimony of the officers who was put before it by the plaintiffs, and doesn't, never mentions or discusses, what to us is a key issue, the failure of the officers to even deploy, let alone use, the pepper spray that they had, which would have allowed them. Well, let's kind of look at it that way. Okay. Obviously, from, I mean, this is clearly a very tragic situation, and that, I guess, to use sort of a, you know, it could be that your, well, your client's family member began this in a situation where what they would call suicide by cop, that he was giving indications to the cops that he wanted the cops to kill him. There was a high-speed chase. There were any, you know, there were a number of things that sort of led up to this. And ultimately, Mr. Lall was killed when he put a big, when he advanced on the officers with a large rock over his head. Yes. And prior to that, the officers had been through a lot of situations. And, in fact, at one point, Mr. Lall tried to pretend that his cell phone was a gun and trying to get the officers to engage on that. And the office, one of the officers realized it was his cell phone, and he said, no, don't shoot. So it kind of, there's a lot of behavior that leads up to this. And I'm understanding your argument to be that the officers, you fault the officers for failing to prevent a situation from deteriorating to the point where a person shot posed an immediate threat to the officers. So what's your strongest authority for denying qualified immunity? Because there's case law out there that obviously said, even though in hindsight you could say, well, you could have used lesser force or whatever, that it appears that the district court felt that the officers, in fact, believed they were an immediate threat at the point that Mr. Lall advanced on with a large rock over his head. Or, but you seem to say, well, the officers could have handled it, could have, would have, should have. But what's your best authority for that? Because the case law seems to say that that doesn't support your position. Your Honor, the case law is clear. And we cite, for example, Blanford versus Sacramento County, that you look at the totality of the circumstances, not the final event that occurred. And the totality of the circumstances in this case demonstrate that the officers not only could have, but knew they should have taken action that never would have resulted in this last minute, with Mr. Lall with a football-sized rock over his head getting close enough. But I guess, do you contend that Mr. Lall did not pose a threat to the safety of the officers when he advanced with a rock over his head? Well, I guess when he was within one or two feet, he may have. But he never should have gotten close to that if the officers had taken the proper action. And I'd just like to refer the Court to the testimony of Officer Otterby in his deposition. And this is found at the excerpt of record at 146 to 147, where he's asked, as of 2005, were you trained to have, during an encounter, two weapons ready at the same time, such as your handgun in one hand and perhaps your pepper spray in another? And he testified yes. He fully testified that the circumstances were, if you had a subject who was able to hurt you or someone else, and you're in self-defense mode, and you wanted to use less than deadly force, you could have both out at the same time. The officers, they had four minutes, more than four minutes, to deal with the situation. When they got out of their automobile, the officers, the first thing they did was take out their handguns. They never deployed the pepper spray. Not only didn't they use it, they never put themselves in a position where they could have used it. They testified that it was effective up to 15 feet. One of the officers says he saw Mr. Lawl with a rock within seven or eight feet, well within the range of pepper spray. But they created the situation. They knew Mr. Lawl was suicidal. They knew he was trying to get himself shot and killed by the officers. They never took steps that could have taken away any danger. There were 10 to 12 officers basically just surrounding Mr. Lawl. You would agree that they exercised a great deal of restraint up until the shooting? They didn't shoot him before he got within one or two feet, but. They exercised a great deal of restraint. They did not want to shoot. Well, that's what they said. However, again, I. Well, even when they could have taken the position that whatever Mr. Lawl had in his hand looked like a gun and justified his self-defense, they didn't shoot. No. Back then, actually, they had been told by Mrs. Lawl and by the, over the radio, that there is no evidence that Mr. Lawl had a gun. And Mr. Lawl was a great distance away trying to bash himself on the head with a rock, trying to impale himself on a stake. He had this cell phone. He could have had a gun stashed in the cart. No one knew and used it. But the officers exercised a great deal of restraint until they felt they were in grave danger themselves. So you would like them to have done something more heroic than to risk their lives. Not heroic, Your Honor. Reasonable and rational under the circumstances. Do you have any case law or the proposition that you seem to be making that what we're looking at here is not what caused the officer to ultimately fire, but rather that if they did not interdict the circumstances that ultimately occurred, that somehow they lose their qualified immunity? Well. That's a novel prospect to me. I don't think I've seen a case like that. I'd be interested to know if there is one. I don't know if there's any case on all fours in the facts with this case. However, the cases do make it clear that you can only use deadly force in circumstances where it's necessary. I totally agree with that, but as was pointed out by my colleagues, the reality here is the officers seemingly exercised great restraint. They were talking to him. They were trying to get him to calm down, trying to get him to do all these things. But he kept coming forward, and when he got the officer with the rock over his head, that's when they shot him. The question is, is there any authority for the concept that when you look at these terrible cases, that you have to go backwards and say, you know, if they had done this a half an hour before, then this would never have happened, and if that happened, then you lose qualified immunity. I understand your position. I'm sorry for your client, the loss. That's a terrible thing. But the Supreme Court's been very clear about these kinds of things, that the officers are entitled to protect themselves from deadly force and serious harm. And by the time your client got to a position where he was shot, he had a big rock over his head and was ready to crash it down on the head of the officer. Yes, but the only reason he did was because they did not take any other steps to stop him, in fact, in terms of talking to him. Well, okay, that doesn't – that's really sort of defied in the record, because they also had tried to – they were calling a canine. They begged Mr. Wall, wait until they get here. Mr. Wall had actually thrown smaller rocks at the officers. They didn't do anything at that point. He pulled his cell phone out and pantomimed like it was a gun, but I think Officer Otterby recognized that it was his cell phone, and he told the other officer, don't shoot. And then he – you know, they tried everything to convince – and Mr. Wall tried to impale himself on a steel rod. And so at this point, you know, why wasn't it reasonable for the officers to assume that, you know – I mean, Mr. Wall, certainly the officers had been on a 45-minute high-speed chase with him as well. And I think at the time they were in some sort of ditch or some sort of culvert or something, so the quarters were close, and I think a large rock can certainly – it certainly can kill someone if it hits them in the head. So – and they're – as he's advancing, how close do you let him get to get it on your head? Because a bullet doesn't stop. You know, it's not – you know, you're not going to be able to do anything if it hits you in the head. Well, yes, Your Honor. I mean, it's unfortunate. It's terribly unfortunate. Well, Your Honor, the cell phone incident happened at the very beginning. After that was over, they had another four minutes to do something. And Honor mentioned that they were talking to him. Well, Mr. Wall was advancing, saying, shoot me, kill me, I want you to shoot you. Shoot me and kill me. And Officer Otterby, and this was in his declaration at ER 227, said, quote, we are going to have to shoot you if you don't drop that rock. Now, here's a man who wants to be shot and killed, and basically he's told by the officer exactly what to do in order to be shot and killed. Don't stop. Don't drop the rock. Keep coming, and we'll shoot you. The question is here, again. So is it your position that they just gave him his wish? Yes, basically. And that they weren't afraid of this giant rock being thrown at them? Well, at the point when he was one foot away, they could say, okay, now we're afraid, and now we're going to shoot him seven times. So you can't let someone get that close? One foot would be the rule. You have to get one foot. No, it could have been two feet. And how far were they, seven? Well, it's a little unclear, because one of the officers said he was six feet away. Everybody else seemed to say he was two or three feet away. But he was advancing. He was advancing. Once he was 15 feet away, the pepper spray could have incapacitated him. And getting blasted full in the face with pepper spray with a rock over your head was surrounded by ten officers. It just boggles the mind to think that he could have been subdued What is your best authority for the fact that they had to use pepper spray at that point? Because the case law seems to say otherwise, that they don't have to use something less intrusive if they're truly in fear for their safety at that point. Well, what the cases say is that the fact that they had a less unlethal method available is one of the factors a jury can take into account in deciding whether what they did was unreasonable. That's what the cases say. And the cases also say Do you want to save your time at this point so that we'll give you some rebuttal time? Thank you. Okay, thank you. Good morning. Good morning. May it please the Court, I'm John Devine from the California Attorney General's Office, and I represent the California Highway Patrol along with Sergeant Otterby and Frank Newman, excuse me, Officer Newman, in this appeal. Okay. I think counsel for the appellant has, I think, fairly well articulated their position. Do you want to – I guess the question that I would ask you to answer is it appears that Mr. Law could have only thrown this giant rock over his head a limited distance. Why was it reasonable for the officers to shoot Mr. Law when they could have retreated to safety? I think that's the point that he's making there. Well, with respect to the pepper spray in that specific argument, it was a dynamic and very chaotic situation going on, and it's almost made from the papers and the descriptions that it's a little more static here. Mr. Law was advancing. He was throwing rocks toward the officers originally, and they were dodging those rocks, and then – Those were smaller rocks, right? Correct. Those were smaller rocks. And then it was only when he started closing the distance, and he did that in a halting fashion, that he then got within the distance where they thought he was an immediate threat to their safety. And so both officers said that they considered using a pepper spray, and from the papers it looks like there's an acknowledgment of the fact that the officers did consider that, but more of a criticism that they didn't actually choose to deploy it at that time. And it was the officers' judgment on the scene that guided their decisions. And in cases like this, there's always going to be an argument that something differently could have been done. And the Supreme Court 25 years ago in Graham recognized that how these cases should be judged is from the perspective of what the officer has seen rather than in the vision of 2020 hindsight. And that's exactly what you have here is a number of different possibilities, and plaintiffs have seized on the pepper spray, but there are other less intrusive means. Let's just say the officer – I think the officer said they were afraid, and the court was convinced that they were afraid for their safety. But then it also has to be – let's say if it had been like a little pebble, and a reasonable officer wouldn't have seen that as something to be afraid about. That's also part of the analysis, correct? So it's not only the personal fear, but whether a reasonable officer would have seen it the same way. Correct, whether a reasonable officer would have seen it. And you actually had four officers. There are four declarations supporting our motion for summary judgment. You have the two officers that fired simultaneously but made independent decisions to do that. You also had CHP Officer Navarro, who was at the scene and had identified the immediate threat and serious harm to the officers, and he was contemplating shooting. And you also have Lieutenant Bonifacio, who was the deputy sheriff, who witnessed the events very closely because he was coordinating the K-9 unit's arrival, and he said that, again, that the officers were in an immediate threat of serious harm. And he also made the additional comment to Sergeant Otterby afterwards that you did what you had to do. What about the argument that they could have just left him there and just gone away and just left – he was in kind of a culvert or something? His car essentially came to rest in a ditch, and then he exited the car. So if they had retreated, did he pose – did Mr. Law pose any additional threat for anyone else? I don't think that they knew that at the time. For instance, the court raised the fact that he brought out his cell phone and pantomimed that it was a gun. They had done a radio check, and it said that Mr. Law didn't own any guns, but they had no assurance that he didn't have a gun. Officer Otterby – How long had this gone on from when they initially got the call until they ended up in the culvert? Well, they initially got the call as a domestic violence call, and that was about 45 to 50 minutes earlier. And so they had been on a high-speed pursuit throughout the Bay Area highways at speeds ranging from 50 to 90 miles an hour. And actually, one of the initial officers responding to the scene from the South City Police Department, he had actually got on the cell phone with Mr. Law and encouraged him to pull over to the side of the road, and Mr. Law refused to do that and just hung up and continued on the chase. It's important, though, for the court that they recognize, because I think there's some representations that the officers weren't considering less intrusive means, and they certainly were. They were trying to get less than lethal weapons out there. At the time, they weren't armed with tasers. This is back in 2005. They were trying to – I'm sorry, I didn't – they weren't – They were not armed with tasers back in 2005, so they didn't have those. So they were seeking a taser, a beanbag shotgun, the canines. In fact, there were three canine units that arrived within a minute or two after the shots were fired. So the officers were very actively seeking, as the district court noted in its order, that they were actively seeking less intrusive means. I think if the court looks at the totality of the circumstances and what the officers faced and how quickly this was unfolding, the dangerousness and reckless behavior of Mr. Law's behavior throughout, his indifference toward not only his own safety but the safeties of others, whether that was his wife with the domestic violence, whether that was motorists during the pursuit, or whether that was actually once he had come to a stop, the facts are clear that he always was creating a situation where it was limiting the actually options of what were available to everyone else to respond to him. Are there any other published cases out there discussing qualified immunity with the backdrop of it starts out, suicide by caught, where the person says, I want you to kill me, and goes on a period of time. And then ultimately they are killed by the officers at a point when the officers claim that they're, you know, feel in fear of their safety. Are there any published cases specifically that deal with qualified immunity in the context of where it starts out with that? No, to answer your question specifically. Well, I mean, I think clearly the legal principles don't preclude, they don't vitiate the issue of qualified immunity because that's the way that it started out. But I'm just curious what, you know, I didn't see anything published exactly in this area similarly. There actually is one. I wrote one. Well, I was just about to refer to the Boyd decision. But the Boyd decision didn't come up on a qualified immunity ground. It came up on evidentiary challenges as to whether or not the suicide by cop theory should have been admitted by the trial court. Similar facts, just the qualified immunity was not involved. But the chase, suicide by cop, threatened before, and he dropped down to the ground, looked like he was going for a firearm to kill him. And the question there was the use of an expert. But it has a similar factual pattern. Correct, correct. And in that one, I guess there was a question of whether he really was suicidal. That's why the expert. In this case, we have Mr. Law repeatedly throughout the incident saying you're going to have to shoot me, whether it's to the South San Francisco Police Department or whether it's later at the scene of the incident. And I do believe with Judge Hellerstein's observation that the officers did exercise great restraint. And it was only at the time when they faced the immediate threat, which counsel has admitted they did face, that they actually retreated along their car and then they shot. And it did lead to a very, you know, unfortunate circumstance. Counsel, I wanted to ask you the same question that I asked opposing counsel. Are you aware of any case law from our circuit of the Supreme Court, or I suppose as a matter of reason elsewhere, that indicates that there is any obligation on the part of officers to use every reasonable effort to avoid an escalating situation that ultimately results in a killing? No. In fact, quite the contrary. The cases in the Ninth Circuit say just the opposite. We don't appear to have any questions. If you don't have anything additional. No, I would thank you for your time. All right. Thank you. Your Honor, just a few points. I think it's crucial to keep in mind that the chase was over. All these incidents were over. Whatever Mr. Law had done before, that was done. The situation was, for over four minutes, he was confronted by 10 to 12 officers. He was not a danger to anyone until the very last bit of this incident. But isn't that really what we have to wrestle with, counsel? The Supreme Court's made it clear that we have to look at this in the perspective of the reasonable officer at the time in the moment. And I think you indicated at the beginning of your presentation that you agreed that if the officer had been hit by this heavy rock in the head, it could have killed him. The question we have to deal with is, did the officers acting reasonably act to save their lives, potentially? And that's really the issue, isn't it? Well, Your Honor, this Court has held, again, this was on a summary judgment. It never went to a jury. And the Court has held that two kinds of evidence that were disregarded by the district court. But the whole purpose of qualified immunity, at least if I understand it correctly, is to avoid having to go through that if, in fact, the officers are in that kind of situation. Now, we have had, and I've written plenty of cases that have said, hey, you know, you don't get qualified immunity here because you've got some really serious facts about what happened, whether it's excessive and so on. But I'm troubled with this situation because I've heard nothing that said, other than maybe the officers should have earlier done something different. I've heard nothing that said these officers were not in danger of lethal harm. And if that's true, I don't know how you get away from the qualified immunity issue. Well, Your Honor, the reason they were, at the very last minute, they were in some danger of harm, was a total failure, which they acknowledged. They did not deploy the alternative methods. But you have no cases that say they have to do that, right? Well, this Court has held a number of times, which we've cited, that the availability of less than lethal means is a factor that the fact finder can take into account. The district court never did that. All right. Thank you. Thank you. We have both of your arguments in mind. We appreciate both of your arguments. This matter will stand submitted.
judges: Hellerstein, Callahan, Smith